## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

KIMBERLEY GARRISON,            )
                              )
    Plaintiff,            )
                              )
    vs.                   )    **Case number 4:12cv0387 TCM**
                              )
CAROLYN W. COLVIN, Acting      )
Commissioner of Social Security,[1]  )
                              )
    Defendant.            )

## MEMORANDUM AND ORDER

This is a 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (the Commissioner), denying the application of Kimberley Garrison for supplemental security income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b.[2]  Ms. Garrison (Plaintiff) has filed an opening brief and reply brief in support of her complaint; the Acting Commissioner has filed a brief in support of her answer.

### Procedural History

Plaintiff applied for SSI in September 2007, alleging a disability as of May 5, 2006, caused by spinal problems, frontal lobe problems, a torn liver, hepatitis C, post-traumatic

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and is hereby substituted for Michael J. Astrue as defendant.  See 42 U.S.C. § 405(g).

[2]The case is before the undersigned United States Magistrate Judge by written consent of the parties.  See 28 U.S.C. § 636(c).

stress disorder (PTSD), and anxiety. (R.[3] at 120-26.) Her application was denied initially and after a hearing held in September 2011 before Administrative Law Judge (ALJ) Jennie L. McLean. (Id. at 6-56.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, and Christy V. Wilson, a certified rehabilitation counselor, testified at the administrative hearing.

Plaintiff testified that she was then 45 years old, has completed the ninth grade, has obtained a General Equivalency Degree (GED), and has a certificate in "[g]ardening and building trades." (Id. at 24-25.) She had married in March 2010; her last name is now Bunton. (Id. at 23-24, 29.)

Plaintiff was incarcerated in March 2005, released in October 2005, incarcerated again for parole violations in June 2006, released again in February 2007, incarcerated again in middle 2008, and released again on February 13, 2009. (Id. at 25-27.) Plaintiff has, at various times, been charged with tampering with a motor vehicle, passing bad checks, and possession of methamphetamine and Xanax. (Id. at 36.) Her parole violations include not reporting to her parole officer and assault. (Id. at 36-37.) When released from prison the last time, she lived with her eldest son until December 2010. (Id. at 27-28.) She

---

[3]References to "R." are to the administrative record filed by the Commissioner with her answer.

then lived by herself for a few months before moving in with her future husband.  (Id. at 28.)  Her husband is now incarcerated for abuse after beating her.  (Id. at 28-29.)  She has been living by herself since then.  (Id. at 29-30.)  Her only sources of support are food stamps and gifts from people or charities.  (Id. at 30-31.)  She also receives Medicaid.  (Id. at 35.)

Plaintiff has a driver's license and, until three months ago, had a vehicle.  (Id. at 31.)  She walks to wherever she has to go, including the grocery store, family services, and her attorney's office.  (Id.)

Plaintiff first started smoking cigarettes at five years old, was allowed to smoke at twelve, and stopped smoking the previous June.  (Id. at 33.)  Plaintiff last used an illegal substance – heroin – on July 2, 2011.  (Id. at 38-39.)  This was a suicide attempt.  (Id. at 40.)  Before that, the last time she had used heroin was June 2010.  (Id. at 41.)

Asked by her attorney what is the primary reason she is unable to hold a full-time job, Plaintiff replied that it is depression.  (Id. at 39.)  She also has anxiety problems being around people, trouble with her thyroid, and difficulties lifting.  (Id.)  Even with medication, she has panic attacks at least once or twice a week.  (Id. at 40.)  Her depression causes her to "cry for days."  (Id.)  She has difficulties with concentration and focus.  (Id.)  Asked how that affects her, she replied that she can not remember.  (Id.)  Plaintiff also has been dealing with PTSD.  (Id. at 41.)  She relapses without counseling, which she receives weekly or, sometimes, daily.  (Id.)  She is taking medications, the side effect of which is drowsiness.  (Id. at 41-42.)  She is beginning to see a new psychiatrist.  (Id. at 42.)  Stress prevents her

from problem-solving, managing her time, and focusing. (Id.) Plaintiff has been reading the same book for a couple of months because she cannot keep track of what she has read. (Id. at 44.)

Plaintiff testified that she cannot stand for longer than thirty minutes. (Id. at 42-43.) Because of her carpal tunnel syndrome, her hands go numb and she is unable to finish washing her dishes. (Id. at 43.) Thyroid problems decrease her appetite. (Id.) She does not take any medication for her thyroid. (Id. at 44.) She has to take breaks when walking because her right leg gives out on her. (Id.) Her "wrists are weak," making it difficult for her to lift anything heavy. (Id.)

Ms. Wilson testified as a vocational expert (VE).

Noting that Plaintiff has no past relevant work, the ALJ asked the VE to assume a hypothetical person of Plaintiff's age and education who can push, pull, lift, and carry twenty pounds occasionally and ten pounds frequently. (Id. at 45.) This person can stand, sit, and walk for six hours in an eight-hour day. (Id. at 45-46.) She can do simple tasks, but can not have any public contact or perform customer service. (Id. at 46.) She can interact appropriately with supervisors and coworkers for superficial work purposes and can adapt to work situations. (Id.) Asked if there are jobs in the regional and national economy this person can perform, the VE replied that there are. (Id.) Specifically, there are jobs as a bakery worker, bench assembler, and electrical equipment assembler. (Id.)

If this hypothetical person can push, pull, lift, and carry fifteen pounds occasionally and less than ten pounds frequently, can stand and walk for two hours out of eight, sit for

six hours out of eight, and has the same non-exertional limitations as the first hypothetical person, there are such jobs as a touch-up screener, addresser, and polisher the person can perform.  (Id. at 46-47.)

If this hypothetical person also is "markedly limited in [her] ability to complete a normal workday or work week without interruption from psychologically-based symptoms," with "markedly" being defined as "resulting in limitations that seriously interfere with the ability to function independently," competitive work would be eliminated.  (Id. at 48.)

The VE stated that her testimony did not conflict with the *Dictionary of Occupational Titles* (DOT).  (Id.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her application, and records from various health care providers.

On a Disability Report – Adult form, Plaintiff listed her height as 4 feet 11 inches and her weight as 129 pounds.  (Id. at 154-63.)  She listed her disabling impairments as spinal problems, frontal lobe problems, a "torn liver," PTSD, swollen legs and feet, and anxiety.  (Id. at 155.)  These impairments prevent her from standing or sitting too long. (Id.)  They first interfered with her ability to work on May 5, 2006, and prevented her from working that same day.[4]  (Id.)  She stopped working, however, in September 2005 when she

---

[4]A prior application had been initially denied in December 2007 and not pursued further. (Id. at 165.)

was incarcerated.  (Id.)  The longest she has worked is for three to four weeks in 1997.  (Id. at 156.)  She had been a housekeeper for a hotel.  (Id.)  She had not been in special education classes.  (Id. at 162.)  On another Disability Report – Adult form, Plaintiff included hepatitis C in her list of disabling impairments.  (Id. at 168-78.)  She reported that she stopped working in April 2009.  (Id. at 169.)  She had then been working part-time for three weeks but could not continue.  (Id.)  She had been in special education classes in 1975 and 1976.  (Id. at 177.)

A friend of Plaintiff's completed a Function Report Adult – Third Party form on her behalf.  (Id. at 179-86.)  She described Plaintiff's day as beginning early because she does not sleep well due to insomnia and panic attacks.  (Id. at 179.)  Plaintiff is prevented from working and socializing because of mental illness and "severe physical abuse," including a broken neck and collapsed lung.  (Id. at 180.)  Her back condition causes her occasional problems with dressing.  (Id.)  Plaintiff occasionally needs to be reminded to take care of her personal needs and grooming due to short-term memory problems.  (Id. at 181.)  She does not go outside often due to her panic attacks and irritable bowel syndrome (IBS).  (Id. at 182.)  Because of her impairments, Plaintiff no longer fishes, gardens, jogs, or exercises.  (Id. at 183.)  Her impairments adversely affect her abilities to lift, sit, understand, squat, kneel, bend, talk, stand, reach, see, walk, remember, concentrate, use her hands, complete tasks, and get along with others.  (Id. at 184.)  She can follow written instructions well, but not spoken ones.  (Id.)  She has to rest for fifteen minutes after walking for thirty minutes.  (Id.)  Because of attention deficit hyperactivity disorder (ADHD), she can pay attention

only for short periods.  (Id.)  She does not get along well with authority figures, nor does she handle stress or changes in routine well.  (Id. at 184-85.)

Plaintiff also completed a Function Report.  (Id. at 195-202.)  She described her daily activities as obsessing about cleaning her apartment, pacing the floor, lying on the couch, and, when necessary, going to doctor appointments.  (Id. at 195.)  If she becomes deeply depressed, her friends help her pay her bills.  (Id. at 198.)  She does not get along well with her mother and sister because her mother's drinking causes Plaintiff to have painful flashbacks.  (Id. at 200.)  Her impairments adversely affect her abilities to lift, sit, squat, stand, reach, see, walk, remember, concentrate, use her hands, complete tasks, and climb stairs.  (Id.)  They do not affect her abilities to understand, use her hands, kneel, bend, or get along with others.  (Id.)  She cannot follow written instructions well, but, if focused, can follow spoken instructions well.  (Id.)  Unless she feels threatened, she can get along well with authority figures, with the exception of the police.  (Id. at 201.)  She does not handle changes in routine well.  (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her application.  (Id. at 209-15.)  Since she had last completed a disability report, her back and pelvis keep going out on her, causing her "great pain."  (Id. at 210.)  This had begun on November 17, 2009.  (Id.)  Her sleep pattern, pain, and depression were all worse.  (Id. at 213.)

A earnings report generated for Plaintiff for the years from 1984 to 2010 list reportable earnings in only fifteen of the twenty-seven years.  (Id. at 127-28, 137, 150.)  In

only four years did the annual earnings exceed $500.  (Id.)  Her  highest annual earnings were $1,348, in 1997.  (Id.)

School records of Plaintiff indicate that she dropped out of high school in August 1983, reentered in August 1984, and dropped out again one week later.  (Id. at 218.)

The medical records before the ALJ are summarized below in chronological order,[5] with the greatest detail being given to those after her alleged disability onset date in May 2006.

Plaintiff was hospitalized in the Phelps County Regional Medical Center (Phelps County) for four days in July 1997 after sustaining a collapsed lung in an automobile accident.  (Id. at 243-51.)

In March 2006, Plaintiff consulted a health care provider at Phelps County for pain medication after having two teeth extracted the week before.  (Id. at 236-37, 277-78.)  She wanted a medical clearance for a program at the Salem Treatment Center for alcohol abuse. (Id. at 237.)  It was noted that she was positive for alcohol and illicit drug use.  (Id.)  She had been released from jail the previous October after being confined for fifteen months. (Id.)  She had been drinking steadily since then.  (Id.)  She had been diagnosed with PTSD and anxiety.  (Id.)  Both were under control when she was taking Xanax. (Id.)  She also had neck and low back pain.  (Id.)  On examination, she was in no acute distress and was alert and oriented to time, place, and person.  (Id.) Straight leg raises were negative.[6]  (Id.)

---

[5]Records of Plaintiff's counseling sessions are separately summarized.

[6]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain

Plaintiff was to have a magnetic resonance imaging (MRI) of her neck, was scheduled for an appointment with the mental health professionals, and was encouraged to see a psychiatrist for her medications due to her history of abuse. (Id. at 236.) The MRI revealed right central disc protrusion at C6-7 impinging on the thecal sac and minimal central disc bulging at C3-4 and C4-5. (Id. at 232, 238.) The spinal cord was normal. (Id.)

Plaintiff returned to Phelps County on April 17 with complaints of neck and mid-back pain and, for the past two weeks, headaches. (Id. at 235-36, 276-77.) She had started the program at Salem Treatment Center and wanted a prescription for Xanax and Vicodin, both of which had helped in the past. (Id. at 235.) She was given the requested prescriptions and was to have an MRI of her thoracic spine. (Id.) She did not keep the appointment for the MRI. (Id.)

On June 8, when confined by the Missouri Department of Corrections (DOC), Plaintiff sought medical treatment for anxiety. (Id. at 262-63.) She reported that she had taken Xanax for over three years. (Id. at 262.) She was oriented to time, place, and person, and had a friendly mood. (Id. at 263.) Her insight and judgment were "poor/fair." (Id.)

 Five days later, Plaintiff had an intake mental health interview. (Id. at 263-64.) She reported a history of sexual abuse by uncle, cousins, step-father's friends, and mother. (Id.) She had been diagnosed with PTSD, generalized anxiety disorder, and depression. (Id. at 263.) On examination, her mental status was within normal limits. (Id.)

---

by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 n.3 (8th Cir. 2009) (internal quotations omitted).

Two weeks later, on June 29, she had an initial visit at the psychiatric clinic.  (Id. at 264-66.)  On examination, her anxiety was controlled, her thoughts were logical, her sleep was adequate.  (Id. at 265.)  She was alert and oriented to time, place, and person, and had a history of polysubstance dependence.  (Id.)  She was diagnosed with PTSD, dysthymic disorder,[7] and major depressive disorder.  (Id.)  Her Global Assessment of Functioning (GAF) was 60.[8]  (Id.)

The next month, Plaintiff reported that she wanted to start therapy.  (Id. at 266.)

On October 11, Plaintiff reported that Celexa was not working, and she was feeling increasingly anxious.  (Id.)

Two weeks later, Plaintiff was less anxious, had a better mood, and was having nightmares about men trying to kidnap her.  (Id. at 267.)   Celexa helped her control her anxiety.  (Id.)  Beginning when she was four years old, she had been sexually abused by her uncle.  (Id.)  One week later, she requested that her dosage of Celexa be reduced.  (Id. at 268.)  "Her mood was pleasant but a bit hyper."  (Id.)  She had been making "peace w[ith] her past."  (Id.)  Two days later, on November 9, Plaintiff participated in a group session,

_____

[7]"The essential feature of Dysthymic Disorder is a chronically depressed mood that occurs for most of the day more days than not for a least two years . . . ."  *Diagnostic and Statistical Manual of Mental Disorders* 376 (4th ed. Text Revision 2000) (DSM-IV-TR).

[8]"According to the [DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34 (emphasis omitted).

reporting that she struggled to recover from a life-threatening rape perpetrated by a man who had killed other victims. (Id. at 268-69.) It was noted that she was "doing a good job of channeling her anger into positive outlets to help with her recovery." (Id. at 268.)

Plaintiff was described on November 21 as having a good mood, insights, and judgment. (Id. at 269.) Her recent and remote memory were intact. (Id.)

The following month, on December 13, it was noted that Plaintiff was not taking her medication as prescribed. (Id.) She wanted the Celexa discontinued. (Id.)

Eight months later, in August 2007, Plaintiff returned to Phelps County with complaints of headaches, which she attributed to her chronic neck pain. (Id. at 233-34, 274-75.) She reported that OxyContin was too strong, but Vicodin helped. (Id.) She had a history of hepatitis C, generalized anxiety disorder, and PTSD. (Id. at 233, 234.) She also reported that her anxiety was worse since her last visit. (Id. at 233.) She was prescribed Xanax, Zoloft, and Trazalene. (Id.)

Plaintiff was again confined by the DOC in October. (Id. at 271-73, 288-90.) She reported at a mental health intake evaluation that she had been sober for sixteen months before relapsing for two weeks. (Id. at 272.) She was again sober. (Id.) Her "drug of choice" was methamphetamine and "'uppers.'" (Id.) She had last used when she was 40 years old; she was then 41 years old. (Id.)

Plaintiff's 2008 medical records are all from the DOC. She had relapsed after drinking with her mother and was reconfined on an assault charge. (Id. at 291-92.)

On March 14, Plaintiff reported that she had been having blood in her stool occasionally for the past two years and had IBS; she wanted a colonoscopy. (Id. at 298.) A culture was negative. (Id. at 298, 303.) Two weeks later, Plaintiff was crying and upset about past abuse. (Id. at 292.) She was oriented to time, place, and person. (Id.) She had a sad, tearful mood, good insight and judgment, and intact recent and remote memory. (Id.)

In July, Plaintiff complained of headaches, reported that she had taken Naproxen in the past and that had helped with the pain. (Id. at 322-23.) She also had gastroesophageal reflux disease (GERD); Prilosec had helped. (Id.) The doctor refused to prescribe Naproxen, but did prescribe Prilosec. (Id. at 323.)

Plaintiff reported in August that she was anxious, but did not want to become dependent on medications. (Id. at 293.) She was instructed on relaxation techniques. (Id.)

In December, Plaintiff reported an increase in anxiety. (Id. at 293-94.) She wanted to resume taking psychotropic medications. (Id. at 293.)

Beginning the previous month, on November 13, and until February 5, 2009, Plaintiff participated in a DOC substance abuse treatment program. (Id. at 366-69.) She reported four prior episodes of substance abuse treatment. (Id. at 366.) On discharge, it was recommended that she attend an aftercare program with weekly support meetings and counseling. (Id.)

Six days after her discharge, on February 11, 2009, she was seen at the Skaggs Community Health Center for complaints of anxiety that had begun the day before. (Id. at 370-72.) She was not depressed. (Id. at 370.) Her symptoms were moderate, and did not

include, for example, headaches, abdominal pain, vomiting, black stools, or joint pain. (Id.) She was prescribed Vistaril and was discharged in good and stable condition. (Id. at 371.)

On June 9, Plaintiff consulted the health care providers at the Family Practice Clinic to establish care. (Id. at 379-80.) She complained of knee discomfort and popping for the past two months, and was prescribed Soma and Percocet. (Id. at 379.)

On June 18, Plaintiff returned to the clinic after falling when her left knee gave out. (Id. at 377-78.) She was having trouble with her knees and lower back. (Id. at 377.) She was scheduled for a colonoscopy, which revealed "five small diminutive polyps." (Id. at 377, 573-78.)

On July 3, Plaintiff reported to the health care providers at the clinic that she was working as a landscaper. (Id. at 374-76.) After a physical examination revealed bruises on her shoulders, she admitted that she was being subjected to domestic abuse. (Id.) She was diagnosed with abnormal thyroid, anxiety, domestic violence, and chronic back pain. (Id.) She was prescribed OxyContin (Id.)

Plaintiff was terminated on July 23 from the treatment program at Gibson Recovery Center after failing to return for treatment.[9] (Id. at 564-65.)

---

[9]This is the only record from the Gibson Recovery Center.

In November, Plaintiff underwent a bone density and vertebral assessment at Phelps County, revealing no vertebral deformities but osteopenia[10] in her spine and neck. (Id. at 395-401.)

X-rays taken in January 2010 of Plaintiff's lumbar spine revealed no abnormalities. (Id. at 567.) X-rays of her cervical spine showed straightening throughout the spine with no fracture or dislocation and a mild multi-level degenerative cervical spondylosis at C4-5, C5-6, and C6-7 levels. (Id. at 568.)

On February 10, Plaintiff consulted the health care providers at Dixon Family Practice (Dixon). (Id. at 490.) She needed medications, including refills for methadone and Xanax. (Id.) She returned two weeks later, but refused a referral to an endocrinologist. (Id. at 489.) On March 10, she requested refills of her medication. (Id. at 488.)

On March 29, Plaintiff consulted M. Akhtar Choudhary, M.D., with the Pain and Sleep Center of Rolla Neurology, about worsening headaches and neck and back pain. (Id. at 420-22.) The pain radiated to her arms and legs and was aggravated by walking, standing, and bending. (Id. at 420.) Numbness and weakness in her right upper and lower extremities made it difficult for her to hold things and gave her the feeling she was going to fall. (Id.) Her headaches were aggravated by neck movements. (Id.) Her medical history was "[s]ignificant for anxiety, arthritis, asthma, broken bone, depression, insomnia, joint injuries, migraine headaches, osteoporosis, [and] vision problems." (Id.) She was

---

[10]Osteopenia is "a condition in which bone density is below normal and may lead to osteoporosis." Mayo Clinic, Bone density test, http://www.mayoclinic.com/health/bone-density-test (last visited March 4, 2013).

married and lived with her husband.  (Id.)  She denied a history of drinking or using drugs. (Id.)  On examination, she was oriented to time, place and person; had normal attention and concentration; and had fluent and comprehensive speech.  (Id. at 421.)  Her muscle tone was normal.  (Id.)  The muscle strength in her hands and in hip flexion was diminished, but was otherwise normal.  (Id.)  She had decreased pin prick sensation at C6-7 and L4-5 on the right.  (Id.)  She was able to walk without support.  (Id.)  "She seem[ed] to have cervical as well as lumbar radiculopathy."  (Id.)  She was to have an MRI of her cervical spine and nerve conduction studies of her right upper and lower extremities.  (Id. at 422.)  She was prescribed OxyContin, Ultram, and Topamax. (Id.)  The MRI of her cervical spine revealed degenerative disc disease, a nodule in the left lobe of her thyroid, and a central disc protrusion at C3-4 with a right central disc protrusion at C6-7 that had not been previously seen.  (Id. at 570-71.)  The  nerve conduction studies were consistent with mild carpal tunnel in her right hand.  (Id. at 414-17.)

Plaintiff was seen on April 6 at the Phelps County emergency room after friends found her unresponsive.  (Id. at 604-07.)  She had had a recent, heavy intake of alcohol. (Id. at 604.)  A CT scan of her head was normal.  (Id. at 605, 606.)

Three days later, she returned to Dixon for refills of her medication, including methadone, Xanax, and Cymbalta.  (Id. at 487.)  On May 7, she was given refills of methadone, Soma, and Cymbalta.[11]  (Id. at 485.)

---

[11]Between the two Dixon visits, Plaintiff consulted Dr. Choudhary.  (Id. at 418-19.)  His notes are generally illegible.

Plaintiff was taken by ambulance to the Phelps County emergency room on June 2 after being assaulted by her husband.  (Id. at 582-603.)  A computed tomography (CT) scan of her cervical spine showed multi-level cervical spondylosis and an indeterminate left thyroid nodule.  (Id. at 592.)  A CT scan of her head showed no fractures or hemorrhages.  (Id. at 593.)  An ultrasound of her thyroid showed multiple bilateral thyroid nodules with dominant nodules in the inferior pole of her left thyroid lobe.  (Id. at 585.)  With the exception of an endotracheal tube inserted when she arrived at the hospital, a chest x-ray was normal.  (Id. at 587-88.)  She was treated with pain medication and released on June 7 in stable condition.  (Id. at 583.)  The same day, she requested refills of her three medications from Dixon.  (Id. at 484.)

On June 27, Plaintiff was treated at the Phelps County emergency room for a headache.  (Id. at 580-81.)

Plaintiff returned to Dixon in July, August, September, and October for refills of her medications.  (Id. at 479-83.)  At the July visit, prescriptions for Wellbutrin and Remeron were added to her other three prescriptions.  (Id. at 483.)

On October 4, Plaintiff underwent an initial intake assessment for Pathways Community Behavioral Healthcare, Inc. (Pathways) for participation in the Comprehensive Pain and Rehabilitation Center (CPRC) program.  (Id. at 453-56.)  She was dressed and groomed appropriately; was oriented to time, place, person, and situation; and had a normal affect.  (Id. at 456.)  Stress, anxiety, and depression were listed as Plaintiff's presenting issues.  (Id. at 453.)  She had three years of college.  (Id. at 454.)  The current symptoms

of her psychiatric disorder included periods of manic activity, severe anxiety, panic attacks, nightmares and flashbacks about traumatic incidents, racing thoughts, difficulty concentrating when depressed, crying, sleeplessness, isolation, loss of appetite, and insomnia. (Id.) Plaintiff reported that Dr. Choudhary had prescribed OxyContin, although she had told him she had an addictive personality and wanted to be taken off the drug, and that Dr. Young Kim[12] had prescribed methadone, but she did not want to take that either. (Id. at 455.) She was trying to see if a former physician, Dr. Parks, would take her back. (Id. at 455, 456.) She was diagnosed with PTSD; major depressive disorder, recurrent, moderate; generalized anxiety disorder; and alcohol dependence. (Id. at 450-52.)

After her early October visit for refills, Plaintiff returned to Dixon on October 27, requesting an early refill of methadone; her Xanax dosage was increased. (Id. at 478.) An ultrasound of her thyroid gland revealed small hypoechoic[13] nodules in the right lobe and a complex nodule in the lower pole of the left lobe. (Id. at 477.) Plaintiff was referred to an endocrinologist. (Id. at 476.)

In November, Plaintiff had a comprehensive assessment at Pathways. (Id. at 436-57.) Plaintiff reported that she had been hospitalized four times for psychiatric reasons, but had never had any outpatient care. (Id.) She did not have any limitations due to physical health or disability. (Id. at 439.) She had not used alcohol or methamphetamine in the past

---

[12]The only legible reference to this physician is to a Dr. Kim Young, who apparently was with Dixon. The parties and the ALJ refer to the physician as Dr. Young Kim; for ease of reference, the Court will do likewise.

[13]Hypoechoic is "[a] region in an ultrasound image in which echoes are weaker or fewer than normal or in the surrounding regions." Stedman's Medical Dictionary, 835 (26th ed. 1995).

thirty days.  (Id. at 440.)  She had been married four times, and was divorcing her current husband.  (Id. at 443.)  She was satisfied with her current living situation.  (Id. at 444.)  She had three years of college, and had not been in special education.  (Id. at 445.)

Subsequently, Plaintiff underwent a functional skills evaluation at Pathways.  (Id. at 428-35.)  She had no significant difficulties in self-care, housekeeping, or shopping.  (Id. at 428, 430.)  She did have significant difficulties in appropriately expressing her anger, maintaining appropriate boundaries, cooperating, coping with conflict, interacting with others, and expressing her needs and desires.  (Id. at 431.)  She had not experienced significant difficulties in her relationships with employers or coworkers.  (Id. at 432-33.)  She was reluctant to ask for help, became confused, decompensated, and was slow to take action.  (Id. at 433.)  She did not have any significant difficulties in coping emotionally with change, but did have such difficulties with making behavioral and cognitive adjustments to change.  (Id. at 434.)  She was considered to be "fully capable of living independently with little help from others."  (Id. at 435.)

Plaintiff returned to Dixon in December for early refills of her medications.  (Id. at 474.)

During this same time period when she was seeking refills of her medications from Dixon, she was consulting Dr. Choudhary.  The records of those visits are generally illegible, but it is clear that Dr. Choudhary consistently continued Plaintiff on her medication.  (See id. at 410-13, 466-67.)  His notes of December 3 include a diagnosis of cervical and lumbar radiculopathy.  (Id. at 463-65.)  On December 27, Plaintiff was started

back on OxyContin – it had apparently been stopped at some point.  (Id.)  On January 18, 2011, the OxyContin was again stopped.  (Id.)

Notes of a February 8, 2011, visit to Dixon for refills of medications indicate that the refills were not due for two weeks.  (Id. at 472.)  They were apparently given on February 16.  (Id.)

On March 4, Plaintiff consulted the health care providers at St. John's Clinic in Lebanon, Missouri, to establish care.  (Id. at 509, 517-31.)  Her medical history included asthma, anxiety, hypothyroidism, arthritis, disc degeneration, and hepatitis C.  (Id. at 517, 520-21.)  She did not drink or use drugs, but did smoke cigarettes.  (Id. at 518.)  On examination, she had neck pain.  (Id. at 524.)  She reported that she had been diagnosed with migraines, but had not needed to take medication for more than a month and was doing fine.  (Id.)  She did not have joint pain.  (Id.)  She had a normal range of motion, normal reflexes, normal muscle tone, and was alert and oriented to time, place, and person.  (Id.)  She was diagnosed with a thyroid nodule, neck pain, chronic pain, tobacco use disorder, and anxiety.  (Id. at 524-25.)  Her Percocet prescription was refilled; her Xanax dosage was increased.  (Id. at 525.)

Two weeks later, Plaintiff was seen at the emergency room at Phelps County.  (Id. at 459-61.)  She was nervous, out of medication, and wanted Xanax, Soma, and Dilaudid.  (Id. at 459.)  She was trying to get disability.  (Id.)  She was given Xanax and Ultram, and advised to followup with her physician at Pathways.  (Id. at 461.)

On March 28, Plaintiff returned to the St John's Clinic. (Id. at 510-16, 505.) It was noted that a thyroid ultrasound had revealed a multinodular goiter and one dominant nodule. (Id. at 513.) Her thyroid hormone was normal. (Id.) A thyroid scan was ordered, and Plaintiff was referred to an endocrinologist. (Id.) Plaintiff reported that she continued to have neck pain and was taking Percocet to help control the pain. (Id.) A referral to a pain management clinic was pending. (Id.)

Four days later, on April 1, Plaintiff went to St. John's Clinic to have lab work done. (Id. at 492, 506-08.) She returned on May 2 to discuss treatment for her hepatitis C. (Id. at 493-504.) Also, she reported that her pain was controlled and requested to be switched to a different, longer-acting medication from which she could eventually taper off. (Id. at 497.) Her prescription for Percocet was changed to the generic form, oxycodone. (Id. at 498.) Plaintiff further reported that she had been started on Wellbutrin by the providers at Pathways; it was helping. (Id. at 497.) She was referred to another clinic for her hepatitis C treatment. (Id. at 498.) She was to return in four weeks. (Id.)

Five days later, Plaintiff had a psychiatric evaluation at Pathways by Shirley Eyman, M.D. (Id. at 426-27.) She was sporadically taking Wellbutrin, i.e., she would take it, stop taking it when it appeared to be working, and then restart. (Id. at 426.) She reported she had not used methamphetamine or alcohol for years. (Id.) On examination, Plaintiff was pleasant, cooperative, alert, and with fair insight and judgment, unremarkable speech, and an anxious affect. (Id. at 427.) She reported that she was always angry. (Id.) Dr. Eyman's

diagnosis was PTSD and depression, not otherwise specified.[14] (Id.)  Plaintiff's GAF was 40.[15] (Id.)

Plaintiff saw Dr. Eyman again on April 25 to request that a disability form be completed.  (Id. at 425.)

In May, Plaintiff went to Dixon for refills of her medications.  (Id. at 469.)

Plaintiff was seen at the St. John's Clinic on June 13 for a follow-up visit and for complaints of a burning sensation in her low back associated with a rash that had appeared one week earlier.  (Id. at 609, 617-22.)  Although her pain was stable, the oxycodone she was taking was not controlling the pain, but was causing her constipation and nausea.  (Id. at 619.)  Plaintiff was prescribed Soma, Percocet, and Xanax.  (Id. at 620.)

Plaintiff had a visit to St. John's Spine Center and St. John's Pain Management Clinic, both in Rolla, Missouri, on June 28.  (Id. at 661-77.)  Her symptoms included joint pain, migraines, thyroid disease, palpitations, depression, anxiety, and constipation.  (Id. at 675.)  She rated her back pain at its best as close to "none," at its worst as "unbearable," and on the average as closer to "none" than to "unbearable."  (Id. at 671.)  Her back pain

---

[14]According to the DSM-IV-TR, each diagnostic class, e.g., adjustment disorder, has at least one "Not Otherwise Specified" category.  DSM-IV-TR at 4.  This category may be used in one of four situations:  (1) "[t]he presentation conforms to the general guidelines for a mental disorder in the diagnostic class, but the symptomatic picture does not meet the criteria for any of the specific disorders"; (2) "[t]he presentation conforms to a symptom pattern that has not been included in the DSM-IV but that causes clinically significant distress or impairment"; (3) the cause is uncertain; or (4) there is either insufficient data collection or inconsistent, contradictory information, although he information that is known is sufficient to place the disorder in a particular diagnostic class.  Id.

[15]A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ."  DSM-IV-TR at 34 (emphasis omitted).

was stabbing and aching; her neck pain was aching. (Id.) Her pain was worse when she stood, walked, or bent over. (Id.) It was better when she lay down. (Id.) She had not smoked for three weeks. (Id. at 674.) On examination, she a normal range of motion in her cervical spine, although she reported some discomfort with flexion and, to a lesser degree, with rotation. (Id. at 663, 668.) She was not tender to palpation of her spine midline in the cervical, thoracic, or lumbar region. (Id.) She was tender over her lower cervical paraspinous muscles, trapezius musculature, and sacroiliac joints. (Id.) Her upper and lower extremity strength was normal and symmetrical. (Id.) Her gait was normal. (Id.) She was diagnosed with cervical radiculopathy and sacroiliac joint discomfort. (Id. at 663, 666.) An MRI of her cervical spine was to be scheduled. (Id. at 666.) She did not drink alcohol or use drugs. (Id. at 665.)

She was to return in one month, and did. (Id. at 610-16, 620, 622.) At this follow-up, July 18 visit, her prescriptions were renewed. (Id. at 612.)

That same day, Plaintiff returned to Dr. Eyman. (Id. at 647-48.) She reported that she was doing badly. (Id. at 647.) Her prescription for Wellbutrin had been discontinued, and she was taking some pills she had left over. (Id.) She was taking Percocet for her pain. (Id.) She was getting Xanax from another physician. (Id.) She wanted to continue taking Ambien, which helped her sleep, and Wellbutrin, which helped with her anxiety. (Id.) She was given prescriptions for both, in addition to another prescription for anxiety, Neurontin. (Id. at 648.)

Plaintiff was admitted on July 3 to Phelps County, complaining of right arm pain, swelling, and redness during the past twenty-four hours after injecting heroin. (Id. at 533-62.) Her medical history included asthma, colon cancer, hepatitis C, and hypothyroid. (Id. at 553.) Plaintiff reported that her psychiatric problems had begun "many years ago" when she started injecting heroin. (Id. at 546.) She had been drug-free for twenty years until relapsing a year earlier. (Id. at 537, 546.) She was given an antibiotic and warm soaks for the swelling in her right elbow. (Id. at 546-47.) The plan was to move Plaintiff to the Center for Psychiatric Services once a bed became available. (Id. at 552.) While hospitalized, Plaintiff reported being raped by a male employee at the hospital; he denied it, saying the act was consensual. (Id. at 548-49.) On being discharged on July 8, Plaintiff refused the transfer to the psychiatric unit, stating that she would consult with them on an outpatient basis. (Id. at 537-38.)

One week later, Plaintiff consulted Uzma Khan, M.D., with Lake Endocrinology Clinic for evaluation of her multinodular goiter. (Id. at 679-84.) Dr. Khan was to obtain lab tests to determine whether the goiter was benign and then would discuss with Plaintiff whether to proceed with a fine needle aspiration. (Id. at 680.)

Plaintiff was seen in August at St. John's Clinic and given refills of her medications, including Neurontin, Xanax, Soma, Valtrex, and Wellbutrin (Id. at 685-94.)

While seeking the above-described treatment in 2011, Plaintiff also had sessions with counselors at Pathways, beginning with one on May 13 when she informed the counselor assisting her with paperwork to obtain financial and housing assistance that she had recently

been diagnosed with hepatitis A and also had hepatitis C, throat cancer, and a liver that was "going bad." (Id. at 659.) Four days later, the counselor noticed that, for the third time in a row, Plaintiff's eyes were droopy and some of her words were slurred. (Id. at 657-68.) Plaintiff denied using anything. (Id. at 657.) Plaintiff did not keep her May 19 appointment and could not be found. (Id. at 656.) She contacted the counselor four days later to reschedule. (Id. at 654-55.) She missed the rescheduled appointment. (Id. at 653.) At the next, July 18 appointment, they discussed housing issues. (Id. at 649-50.) Plaintiff was unable to keep her July 22 appointment. (Id. at 645-46.) Four days later, Plaintiff discussed with the counselor going to the treatment center because she had been notified that she was going to be evicted as she had not had the utilities turned on where she was living and was considered a squatter. (Id. at 639-40.) The following day, she reported that she had been clean and sober for two weeks. (Id. at 643-44.) On July 29, Plaintiff reported to her counselor that some of her Wellbutrin pills were missing from her pill case, and her Percocet, Soma, and Ambien were entirely gone. (Id. at 636-37.) A woman who Plaintiff had let stay with her had taken them. (Id. at 636.) Plaintiff missed the next appointment, and when asked on August 12 about an apparent needle mark on her right arm, she denied using during the past two weeks and explained that it was from an infection when she had last used the month before. (Id. at 634-35.) On August 16, Plaintiff's counselor took her to the drugstore for refills of prescriptions. (Id. at 632-33.) Six days later, Plaintiff relapsed and took a thirty-day supply of Xanax and Ambien in four days. (Id. at 630-31.)

Also before the ALJ were reports of examining and non-examining medical consultants and an assessment by a treating physician of Plaintiff's mental functional capacities.

Pursuant to an earlier application, Plaintiff underwent a psychological evaluation by Brian Cysewski, Ph.D., a clinical psychologist, in June 1998. (Id. at 284-87.) She reported dropping out of school in the ninth grade after becoming pregnant. (Id. at 284.) She had been an average student and had not been in any special education classes. (Id.) She was unable to work due to a broken right foot which made it difficult for her to stand. (Id.) She was a recovering alcoholic. (Id.) She began drinking in preschool; however, her drinking became problematic when she was in the seventh grade. (Id. at 285.) She had been married three times. (Id.) "[M]ost if not all of" her husbands had been physically abusive. (Id.) She had been taking Zoloft, had stopped, and was now having nightmares. (Id. at 284, 285.) Her intellectual functioning appeared to be in the low average range. (Id.) Dr. Cysewski diagnosed her with dysthymia, rule out[16] PTSD, and alcohol dependence, "reportedly in remission." (Id.) Her GAF was 60. (Id. at 286.)

In October 2005, pursuant to another, earlier application, Plaintiff underwent a psychological evaluation by Thomas J. Spencer, Psy.D. (Id. at 279-83.) Plaintiff explained to Dr. Spencer that she was applying for SSI because she had "a hard time holding a job" due to her anxiety and PTSD. (Id. at 279.) She had been diagnosed in 1988 with PTSD

---

[16]"'Rule out' in a medical record means that the disorder is suspected, but not confirmed – i.e., there is evidence that the criteria for a diagnosis may be met, but more information is needed in order to rule it out." **Byes v. Astrue**, 687 F.3d 913, 916 n.3 (8th Cir. 2012).

caused by "a lengthy childhood history of sexual abuse . . . ." (<u>Id.</u>) Also, when an adult, she had witnessed a murder. (<u>Id.</u>) She had recently decided to let her children be adopted. (<u>Id.</u>) She was easily startled and was depressed, having had to go through her children's things prior to a move. (<u>Id.</u> at 280.) She was tired and, occasionally, felt hopeless and helpless. (<u>Id.</u>) She was not on any psychotropic medication because she was not on Medicaid and could not afford to see a psychiatrist. (<u>Id.</u>) She had been suffering from insomnia. (<u>Id.</u>) She had been diagnosed in 2003 with hepatitis C. (<u>Id.</u>) Because of her pain, she could not stand for long. (<u>Id.</u>) Because of a head injury, she had some memory and concentration problems. (<u>Id.</u>) She reported that she had first been sexually abused by her baby sitter's boyfriend and later by her uncle and several of her step-father's friends. (<u>Id.</u>) When she told her mother about the abuse, her mother blamed her. (<u>Id.</u>) From the ages of six to seventeen, she was sexually abused. (<u>Id.</u>) Before entering high school, she attended sixteen different schools. (<u>Id.</u>) She was married, but had not seen her husband for ten years. (<u>Id.</u>) She had four children, ranging in ages from six to twenty-two. (<u>Id.</u>) She had recently terminated her parental rights to the two youngest children. (<u>Id.</u>) Currently, she was attending college, although she admittedly had trouble paying attention and focusing. (<u>Id.</u> at 281.) Her longest period of employment was for one year. (<u>Id.</u>) She had never been fired and always got along well with her coworkers and supervisors. (<u>Id.</u>) Plaintiff further reported that she started drinking regularly at sixteen and that alcohol had been put in her bottle to help her sleep. (<u>Id.</u>) She had been sober for the past thirteen months. (<u>Id.</u>) Around the same time as when she stopped drinking, she stopped using

methamphetamine intravenously. (Id.) She was on parole. (Id.) Plaintiff did most of her household chores by herself. (Id.)

On examination, Plaintiff was appropriately dressed, was in no acute physical distress, was friendly and cooperative, and had intact insight and judgment. (Id. at 282.) She had "a mildly dysphoric affect." (Id.) Her flow of thought was without loose associations or circumstantial or tangential thinking. (Id.) Her thought content was positive for depression. (Id.) She appeared to be of average intelligence. (Id.) Dr. Spencer diagnosed Plaintiff with PTSD; major depressive disorder, recurrent, moderate; rule out generalized anxiety disorder; and alcohol and methamphetamine dependence by history. (Id.) Her GAF was 50-55. (Id.) He recommended that she follow up with a psychiatrist for treatment of her mood and anxiety disorders. (Id. at 283.)

Pursuant to Plaintiff's current SSI application, she was again evaluated by Dr. Spencer in November 2009. (Id. at 402-06.) Plaintiff's primary complaints were PTSD, with which she had been first diagnosed twenty years earlier, generalized anxiety, and "'health issues.'" (Id. at 402.) He summarized her history as she reported it, describing it as "very convoluted." (Id.) This history includes being first sexually assaulted when she was four by an uncle, next by a babysitter's boyfriend for several years, and then by an owner of a tattoo parlor. (Id.) This last person also prostituted her with soldiers. (Id.) A young cousin died in a fire set by Plaintiff's boyfriend. (Id.) She had been in and out of prison between 2003 and August 2009. (Id.) She reported that she could not work because of anxiety. (Id.) She has panic attacks when she leaves her home, which was currently in

a hotel or with her mother because she was without a permanent residence. (Id. at 402, 403.) She "self-medicated with alcohol," but had not had a drink for two months. (Id.) She was angry and depressed. (Id. at 403.) Her physician, Dr. Parks, prescribed her Xanax and Percocet. (Id.) She did not consistently seek treatment by a psychiatrist or psychologist. (Id.) She complained of hip pain and discomfort, but walked with a normal gait. (Id. at 403, 404.) She had recently been diagnosed with hyperthyroidism. (Id. at 403.) After undergoing a CT scan of her head, she had been informed that "'there was shrinkage in [her] frontal lobe.'" (Id.) Because of anxiety and depression, she had quit her last job that June after working as a landscaper and housekeeper for three months. (Id. at 404.) Her longest period of employment was three years. (Id.) She had no problem getting along with people in the workplace. (Id.) On examination, her speech was flat, her mood was mildly dysphoric and irritable, her flow of thought was intact and organized, and her insight and judgment were questionable. (Id. at 404-05.) Dr. Spencer diagnosed her with chronic PTSD; recurrent, moderate major depressive disorder; generalized anxiety disorder; alcohol dependence, in early remission by her account; and a GAF of 45 to 50.[17] (Id. at 406.) He opined that her mental illness interfered with "her ability to engage in employment suitable for her age, training, experience, and/or education." (Id.) This "disability could exceed 12 months although with appropriate treatment, compliance, and continued sobriety, prognosis may improve." (Id.)

---

[17]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

Two months earlier, in September 2009, assessments of Plaintiff's mental functioning abilities and limitations were completed by Glen D. Frisch, M.D., a non-examining medical consultant  (Id. at 381-94.)  On a Psychiatric Review Technique form (PRTF), Dr. Frisch assessed Plaintiff as having an anxiety-related disorder, i.e., anxiety/panic disorder, and substance abuse disorders, i.e., a history of alcohol and amphetamine dependence.  (Id. at 384, 387-88, 390.)  These disorders resulted in mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (Id. at 392.)  They did not cause any repeated episodes of decompensation of extended duration.  (Id.)

On a Mental Residual Functional Capacity Assessment, Dr. Frisch assessed Plaintiff as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two.  (Id. at 381.)  In the area of sustained concentration and persistence, she was moderately limited in four of eight listed abilities, i.e., carrying out detailed instructions; maintaining attention and concentration for extended periods; working in coordination with or proximity to others without being distracted by them; and completing a normal workday and workweek without interruptions from psychologically-based symptoms.  (Id. at 381-82.)  She was not significantly limited in the remaining four abilities.  (Id.)  In the area of social interaction, Plaintiff was moderately limited in two of the five abilities, i.e., interacting appropriately with the general public and accepting instructions and responding appropriately to criticism from supervisors, and was not

significantly limited in the remaining three.  (Id. at 382.)  In the area of adaptation, Plaintiff was again moderately limited in two abilities, i.e., responding appropriately to changes in the work setting and traveling in unfamiliar places or using public transportation.  (Id.)  She was not significantly in the remaining two abilities.  (Id.)

In May 2011, a treating physician of Plaintiff's[18] completed a Medical Source Statement – Mental form on her behalf.  (Id. at 423-24.)  He rated Plaintiff as moderately limited in all three abilities listed for the category of understanding and memory.  (Id. at 423.)  She was markedly limited in three of the eight abilities listed for the category of sustained concentration and persistence, i.e., her ability to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; and to complete a normal workday and workweek without interruption from psychologically-based symptoms.  (Id. at 423-24.)  She was moderately limited in the remaining five abilities.  (Id.)  She was markedly limited in three of the five abilities listed for the category of social interaction, i.e., her ability to interact appropriately with the general public; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (Id. at 424.)  She was moderately limited in the remaining two abilities.  (Id.)  In the category of adaptation, Plaintiff was markedly limited in two abilities – the ability to respond appropriately to changes in the work setting

---

[18]The signature is illegible; however, the ALJ refers, without contradiction, to the statement being that of Dr. Kim.

and the ability to set realistic goals or make plans independently of others – and was moderately limited in the remaining two abilities. (Id.) The form provided that the assessment of Plaintiff's mental abilities was to be made as if Plaintiff had "stopped doing drugs and/or alcohol." (Id. at 423.)

### The ALJ's Decision

Analyzing Plaintiff's application under the Commissioner's five-step evaluation process, the ALJ first noted that Plaintiff had not engaged in substantial gainful activity after the filing date of her SSI application. (Id. at 11.) She next found that Plaintiff had severe impairments of back pain, hepatitis C, thyroid cancer in remission, depression, anxiety, and PTSD. (Id.) Her right hand impairment was not severe. (Id.) The severe impairments Plaintiff did have did not, singly or in combination, meet or equal an impairment of listing-level severity. (Id.) Specifically, her mental impairments resulted in only mild restrictions in her activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace. (Id. at 12.) For instance, Plaintiff did her laundry, prepared her own meals, washed dishes, walked, fished, jogged, and spent time with others. (Id.) There were "multiple" references in the record to Plaintiff being cooperative and pleasant. (Id.) Although Plaintiff testified that she had difficulties concentrating, remembering, and completing tasks, "memory skills testing demonstrated an ability to recall three out of three object [sic] immediately and two out of three objects after five minutes." (Id.) "[S]he performed serial threes, spelled 'world' backwards, and repeated six digits forward." (Id.) She could do simple math calculations.

(Id.) And, she had not experienced any episodes of decompensation of extended duration. (Id.)

The ALJ concluded that Plaintiff has the residual functional capacity to perform light work with additional limitations of being restricted to simple tasks with routine supervision, no contact with the public, and no work involving customer service. (Id. at 13.) Plaintiff was "able to interact appropriately with supervisors and coworkers for superficial work purposes" and "to adapt to work situations." (Id.) In reaching this determination, the ALJ evaluated her credibility, finding that her daily activities – including jogging, fishing, walking, and shopping – belied her allegations of disabling difficulties in such exertional activities as standing, lifting, walking, and sitting and in such mental activities as remembering and concentrating. (Id. at 13-14.) Another factor detracting from her credibility was her felony convictions for tampering and forgery. (Id. at 14.) Also, her allegations were not supported by the objective medical evidence, or by her failure to show for doctor appointments. (Id. at 14-15.) Noting that Plaintiff had a history of substance abuse, the ALJ concluded that the abuse was "not a contributing factor material to the determination of disability." (Id. at 15-16.) The ALJ considered, but gave little weight to the opinions of Drs. Spencer and Kim. (Id. at 16.) The function report completed by Plaintiff's friend was supportive of Plaintiff's allegations, but did not establish that she was disabled. (Id.) The opinions of Dr. Frisch were both internally consistent and consistent with the record. (Id.)

Plaintiff had no past relevant work. (Id.) With her age, education, and RFC, there were, however, jobs within the national economy she could perform, as describe by the VE. (Id. at 17-18.) Consequently, Plaintiff was not disabled within the meaning of the Act. (Id. at 18.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled "if [s]he is unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . [s]he would be hired if [s]he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 416.920(a)(4)(i). Second, the claimant must have a severe impairment. See 20 C.F.R. § 416.920(a)(4)(ii). A severe impairment is "any impairment or combination of

impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  20 C.F.R. § 416.920(c).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. § 416.920(a)(4)(iii) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations."  **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'"  **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)).  "'[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations.'"  **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility.  **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217.  This evaluation requires that the ALJ consider "'(1) the claimant's daily activities; (2) the

duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011) (quoting Moore, 572 F.3d at 524). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" **Id.** (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). Moreover, an ALJ is not required to methodically discuss each of the relevant credibility factors, "'so long as he acknowledge[s] and examine[s] those considerations before discounting a claimant's subjective complaints.'" **Renstrom v. Astrue**, 680 F.3d 1057, 1067 (8th Cir. 2012) (quoting Partee v. Astrue, 638 F.3d 860, 865 (8th Cir. 2011)).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 416.920(a)(4)(iv). Additionally, "[a]n ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as she actually performed it or as generally required by employers in the national economy." **Samons v. Astrue**, 497 F.3d 813, 821 (8th Cir. 2007). The burden at step four remains with the claimant. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ is to find the claimant to be disabled. See 20 C.F.R. § 416.920(a)(4)(v).

The ALJ's decision – adopted by the Commissioner when the Appeals Council denied review – whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Perkins v. Astrue**, 648 F.3d 892, 897 (8th Cir. 2011) (quoting Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009)). When reviewing the record, however, the Court "'must consider evidence that both supports and detracts from the ALJ's decision, but [may not] reverse an administration decision simply because some evidence may support the opposite conclusion.'" **Id.** (quoting Medhaug, 578

F.3d at 813). "'If, after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Id.** (quoting Medhaug, 578 F.3d at 897). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the Commissioner's adverse decision is not supported by substantial evidence on the record as a whole. Specifically, the ALJ erred (1) when determining her RFC because she (a) relied on her own opinion rather than any medical evidence, (b) failed to define Plaintiff's impairments, specifically her back impairment, and (c) found no workplace restrictions due to Plaintiff's neck and carpal tunnel problems; (2) by improperly rejecting the opinions of Drs. Kim and Spencer; (3) by failing to develop the record; and (4) when rejecting her testimony. The Commissioner disagrees.

"The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations." **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (July 2, 1996)); accord **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003). "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and observations of treating

physicians and others." **Roberson**, 481 F.3d at 1023.  See also SSR 96-8p, 1996 WL 374184 at *5 (listing factors to be considered when assessing a claimant's RFC, including, among other things, medical history, medical signs and laboratory findings, effects of treatment, medical source statements, recorded observations, and "effects of symptoms . . . that are reasonably attributed to a medically determinable impairment").

In the instant case, the ALJ concluded that Plaintiff has the residual functional capacity to perform light work with additional limitations of being restricted to simple tasks with routine supervision, no contact with the public, and no work involving customer service. (R. at 13.)  The ALJ further concluded that Plaintiff is also "able to interact appropriately with supervisors and coworkers for superficial work purposes" and "to adapt to work situations."  (Id.)  There is no evidence to support this latter finding.[19]

Specifically, there is no evidence that Plaintiff has been able to interact appropriately with either supervisors or coworkers on a sustained basis.  See **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (RFC should include those capacities that claimants can demonstrate on sustained basis).  Since her alleged disability onset date of May 2006, she has been in and out of prison on parole violations, including failing to report to her parole officer, has not been at one address for any length of time, and has not maintained any

---

[19]Plaintiff also challenges the ALJ's reference to her back pain without specifying the underlying condition and the ALJ's failure to recognize her neck and hand impairments as severe. These challenges are unavailing.  As noted by the Commissioner, it is not the diagnosis of a condition that is determinative; rather, it is the limitations resulting from the underlying condition. See **Collins ex rel. Williams v. Barnhart**, 335 F.3d 726, 730-31 (8th Cir. 2003).  The limitations imposed by Plaintiff's back pain and by her neck and hand impairments depended on her credibility, which is discussed below.

relationship, with family, friends, or authority figures, for any length of time. The record shows that her longest period of employment is three to four weeks,[20] and this occurred nine years before her alleged disability onset date. Although the ALJ noted that Plaintiff reported that she had no significant difficulties in self-care, she disregarded Plaintiff's contemporaneous report that she did have difficulties in cooperating, coping with conflict, and interacting with others. The ALJ emphasized that Plaintiff jogged, fished, and exercised, although these activities were listed as ones that Plaintiff *used* to engage in prior to her impairments. The ALJ also disregarded Plaintiff's report that she does not handle changes in routine well and has behavioral and cognitive problems in adjusting to change.

The Court notes that the lack of support in the record for the ALJ's inclusion in Plaintiff's RFC of an ability to interact appropriately with supervisors and coworkers when necessary for work and to adapt to work situations does not equate with a finding that Plaintiff does not have either ability or, if she is lacking both, that the absence is not due to substance abuse. "[A]n individual shall not be considered disabled for purposes of [Title XVI] if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 1382c(a)(3)(J). "[A] claimant has the burden to prove that alcoholism or drug addiction is not a contributing factor." **Kluesner v. Astrue**, 607 F.3d 533, 537 (8th Cir. 2010); accord **Pettit v. Apfel**, 218 F.3d 901, 903 (8th Cir. 2000). "The 'key factor' in

---

[20]Plaintiff is inconsistent in her description of the longest period she has been employed. This inconsistency, and others, are addressed below.

determining whether drug addiction or alcoholism is material to a determination of disability is whether the claimant would still be found disabled if he or she stopped using drugs or alcohol." **Id.** "When a claimant is actively abusing drugs [or alcohol], th[e] inquiry is necessarily hypothetical, and thus more difficult than if the claimant had stopped." **Kluesner**, 607 F.3d at 537. See e.g. **Vester v. Barnhart**, 416 F.3d 886, 890 (8th Cir. 2005) (finding ALJ properly denied benefits to claimant who was infrequently sober but who, during those sober periods, demonstrated an ability to work absent the alcohol abuse). See also 20 C.F.R. § 416.935(b) (outlining process to be followed when there is medical evidence of drug addiction or alcoholism).

The record before the ALJ is replete with references to Plaintiff's alcohol and drug abuse. Periods of incarceration were regularly followed by relapses on release. Denials of use of alcohol or drugs were followed by visits to emergency rooms for being found unconscious after drinking or for treatment of an infection caused by injecting heroin. Plaintiff denied using alcohol or drugs when her Pathways counselor asked about why her eyes were droopy and her words slurred; three months later, she took a thirty-day supply of Xanax and Ambien in six days. She denied using drugs, yet was regularly prescribed methadone, used to "reduce[ ] to withdrawal symptoms in people addicted to heroin or other narcotic drugs." Methadone, http://www.drugs.com/search.php?searchterm=methadone (last visited March 19, 2013).

The evidence in the record that Plaintiff had not abstained from drugs and alcohol is also relevant to the weight to be given the opinions of Dr. Kim, Plaintiff's treating physician

who prescribed methadone, and of Dr. Spencer, the consulting physician who was told by Plaintiff that she "self-medicated" with alcohol but had not had a drink for two months, see Record at 402-03, but had not been told about any drug use.  See **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010); **Owen**, 551 F.3d at 800 ("[A] claimant's noncompliance can constitute evidence that is inconsistent with a treating physician's medical opinion and, therefore, can be considered in determining whether to give that opinion controlling weight.").

In addition to challenging the ALJ's RFC determination, Plaintiff takes issue with her rejection of Plaintiff's testimony as not being fully credible.

"'If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Renstrom**, 680 F.3d at 1065 (quoting Juszcyzk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008)).  One reason cited by the ALJ in the instant case is not supported by the record.  Specifically, the ALJ cited daily activities of jogging, fishing, walking, and shopping as being inconsistent with Plaintiff's allegations of disabling difficulties.  These activities, however, were listed as ones that Plaintiff engaged in before her impairments became disabling.

Another reason cited by the ALJ was the lack of supporting objective medical evidence.  Although "'[a]n ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them," **Renstrom**, 680 F.3d at 1066 (quoting Wiese, 552 F.3d at 733), the absence of objective medical evidence to

support a claimant's complaints is a proper consideration when assessing that claimant's credibility, **id.** at 1065.  There is such absence in the instant case.

A third reason is Plaintiff's failure to show for doctor appointments.  This also is a proper consideration.  See **Id.** at 1067.  The Court notes, however, that Social Security Ruling 96-7 provides that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain the infrequent or irregular medical visits or failure to seek medical treatment."  SSR 97-7p, 1996 WL 374186, at *7 (July 2, 1996).  In **Pate-Fires**, 564 F.3d at 945 (8th Cir. 2009), the court held that the claimant's failure to take her psychiatric medication could be caused by her schizoaffective disorder and that, consequently, the ALJ had erred by finding that the noncompliance was not justified.  The court later held in **Wildman**, 596 F.3d at 966, that the **Pate-Fires** holding did not apply to a claimant who suffered from depression and had failed to follow a prescribed diet.  Plaintiff's failure to follow a recommended course of treatment, including recovery programs for substance abuse, could be due to that abuse, to incarceration, or to a lack of motivation.  On remand, the ALJ might solicit an explanation from Plaintiff for her failure.[21]

Other factors that detract from Plaintiff's credibility are her poor work record.  See **Pearsall**, 274 F.3d at 1218 ("A lack of work history may indicate a lack of motivation to

_____

[21]The Court employs the permissive "might" because other considerations support the ALJ's adverse credibility finding and any error in not soliciting an explanation is harmless.

work rather than a lack of ability."); **Dipple v. Astrue**, 601 F.3d 833, 837 (8th Cir. 2010) (listing a claimant's work record as consideration when evaluating her credibility).

Also detracting for Plaintiff's credibility are the inconsistencies in the record. "An ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole." **Van Vickle v. Astrue**, 539 F.3d 825, 828 (8th Cir. 2008); accord **Halverson v. Astrue**, 600 F.3d 922, 932 (8th Cir. 2010). In the instant case, such inconsistencies include Plaintiff's differing accounts of how much education she has, whether she was in special education classes, how long her maximum period of employment was, by whom and when she was first sexually abused, and for long she had not abused drugs or alcohol. These inconsistencies are of events that do not change over time. For instance, she either had three years of college or she did not.

The Court has considered other challenges by the Plaintiff to the ALJ's decision and finds such to be without merit.

### Conclusion

For the foregoing reasons, the case shall be reversed and remanded for the ALJ to reexamine Plaintiff's mental residual functional capacities and, if necessary, the extent to which any diminished capacity is attributable to drug or alcohol abuse. See e.g. **Watkins v. Astrue**, 414 Fed.Appx. 894, 897 (8th Cir. 2011) (reversing and remanding case for determination of whether claimant's mental problems were linked to his abuse of illegal drugs); **Conklin v. Astrue**, 360 Fed.Appx. 704, 707-08 (8th Cir. 2010) (same). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and this case is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for the further, limited proceedings as set forth above.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  25th  day of March, 2013.